UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:

Edna B. Williams,                                    Case No. 06-40815
                                                     Chapter 7
                         Debtor.                     Hon. Phillip J. Shefferly
_____/

**OPINION GRANTING IN PART AND DENYING IN PART**
**APPLICATION FOR POST-CONFIRMATION FEES**

I. Introduction

This opinion addresses an application for fees by the Debtor's counsel in a Chapter 13 case,

which has since converted to Chapter 7. The fees at issue were all incurred post-confirmation. The

Chapter 13 Trustee and the Debtor have objected to the fees. Their objections illuminate a range

of issues that arise in Chapter 13 cases when a thinly funded plan is confirmed, the debtor later

experiences a setback, and the debtor's attorney fees to save the case continue to mount. For the

reasons set forth in this opinion, the Court has determined to grant the application in part and deny

it in part, awarding post-confirmation attorney fees in the amount of $2,804 and reimbursement of

costs in the amount of $402.65.

II. Facts

On January 24, 2006, Edna Williams filed a Chapter 13 petition for relief. The Debtor was

represented by Frego & Brodsky PLC ("Frego Law Firm"). According to her schedules, the Debtor

owned a home located at 8324 Desoto, Detroit, Michigan encumbered by a mortgage with a balance

in excess of $68,000. It did not appear from the schedules that there was any equity in the home,

because the Debtor listed its value at $55,000. The Debtor's schedules also showed that the Debtor

owned two automobiles. One of them was a 1999 Ford Taurus and the other a 2005 Ford 500. The

Debtor's schedules showed that the Taurus was encumbered by a lien in favor of Dearborn Village Credit Union with an outstanding balance in excess of $7,000 and the Ford 500 was encumbered by a lien in favor of Americredit with an outstanding balance in excess of $22,000. The Debtor's summary of schedules listed secured debts on her home and two vehicles in the aggregate amount of $98,746.82. The Debtor's schedules also showed a priority unsecured debt of $1,400 to the City of Detroit and total unsecured non-priority debts of $10,571.76. At the time she filed her case, the Debtor was employed full time at Superior Casket and had been working there for four years. The Debtor's non-filing spouse was unemployed and did not contribute any income to the Debtor's household. Schedule I showed that the Debtor's monthly income was $2,567, after payroll deductions for taxes, social security and insurance. The Debtor's schedule J showed that her monthly expenses were $1,177, leaving a surplus of monthly net income of $1,390. According to the proof of claim filed by Argent Mortgage Company, the mortgagee on the Debtor's home, the Debtor owed an arrearage of $3,979.56 on her mortgage at the time of her bankruptcy petition, consisting of three monthly mortgage payments of principal and interest, together with an escrow shortage, inspection fees, appraisal fees and attorney fees and costs.

On February 8, 2006, the Debtor filed her Chapter 13 plan. The plan proposed that the Debtor make weekly payments of $320.73 for 60 months. In Class One, entitled "Administrative Expenses," the plan listed the Trustee fees "as determined by statute" together with adequate protection payments on each of the two vehicles. The adequate protection payment for the Ford 500 was $171 and the adequate protection payment for the Taurus was $71.70. There is no explanation as to how these amounts were determined but, from reviewing the proofs of claims filed by Americredit and Dearborn Village, it appears that these amounts are consistent with the requirement

-2-

of Local Rule 4001-7 that pre-confirmation adequate protection payments be "thirty percent of the debtor's regular monthly obligation to secured creditors." L.B.R. 4001-7(a)(3) (E.D.M.). The Debtor's plan also provided for an administrative expense claim consisting of the Debtor's attorney fees and costs in the amount of $2,500, less the sum of $100 already paid by the Debtor, leaving a balance of $2,400 owing to the Frego Law Firm. The plan stated that this balance would be "paid at the rate of $2,400 per month." In other words, the plan provided that the entire attorney fee would be paid in full out of the first distribution by the Trustee after confirmation, ahead of all other creditors.

Class Two of the Debtor's plan, entitled "Continuing Claims," provided for a monthly mortgage payment of $657 with respect to the Debtor's home. The Debtor's plan did not list any Class Three claims but did list a claim in Class Four, entitled "Arrearage on Continuing Claims," consisting of pre-petition arrearage on the Debtor's mortgage in the amount of $3,500 to be paid at the rate of $97.22 per month for 36 months. This amount was less than the amount of the arrearage shown on the proof of claim filed by Argent, which stated the pre-petition arrearage at $3,979.56.

Class Five, entitled "Non-continuing Secured Claims," identified three secured claims. Americredit was listed as a secured creditor with respect to the Ford 500, Dearborn Village was listed as a secured creditor with respect to the Taurus, and the Board of Water Commissioners was listed as a secured creditor with respect to the Debtor's residence. In describing the treatment for the two automobile liens in this class, the plan stated that "adequate protection payments shall be paid until such time as funds become available to pay equal monthly installments over the remaining length of the plan." For whatever reason, the plan neglected to state the monthly payments of principal and interest that would be made to Americredit or Dearborn Village after confirmation of

the plan, but instead indicated only the monthly adequate protection payments to them. However, the plan did contain a column entitled "Total to Pay (Incl. Interest)" next to each of these secured creditors in Class Five. The "Total to Pay (Incl. Interest)" to Americredit for the Ford 500 was shown as $27,426.63 to be paid over 60 months. The "Total to Pay (Incl. Interest)" for Dearborn Village was shown as $4,665.48, again to be paid over 60 months. Because the plan did not say what the monthly payments to each of these secured creditors would be under the plan, the only way to ascertain the monthly amounts required to be paid is by dividing the "Total to Pay (Incl. Interest)" by 60. For Americredit, that means that the monthly payment was $457.11 (i.e., $27,426.63 divided by 60). For Dearborn Village, that means that the monthly payment was $77.76 (i.e., $4,665.48 divided by 60). Curiously, although the plan did not state the monthly payment to Americredit or Dearborn Village, it did state the "monthly payment" for the third secured creditor in Class Five, the Board of Water Commissioners, at $9.17, after also stating the "Total to Pay (Incl. Interest)" for that creditor as $550.00 and indicating that the payment of this sum would be made over 60 months. In Class Six, entitled "Priority Unsecured Claims," the plan provided for payment of a priority claim of $1,400 to the City of Detroit with no interest, but stated neither a monthly payment nor the number of months for payment of this claim. The plan did not list any Class Seven claims, but did state that Class Eight, entitled "General Unsecured Claims," would receive a zero distribution.

The Trustee, Americredit and Dearborn Village all objected to the Debtor's plan. The Trustee objected to the Debtor's failure to include future income tax refunds in her plan and to her proposed zero distribution to general unsecured claims. Americredit and Dearborn Village objected to their treatment as secured creditors under the plan. The confirmation hearing was scheduled for April 18, 2006. The case was not called on the Court's contested docket for that day because the

-4-

Trustee, Americredit and Dearborn Village had reached an agreement with the Debtor to resolve all of their objections. On April 19, 2006, the Court signed an order confirming plan, which was submitted for entry after it was first approved for entry by the Frego Law Firm, the Trustee, Americredit and Dearborn Village.

The order confirming plan contained several provisions that were different from the plan. First, instead of allowing and paying $2,400 of attorney fees and costs, as provided in the plan, the order confirming plan stated that the Frego Law Firm's administrative expense claim for attorney fees and costs would be "allowed in the total amount of fees and costs by application." Instead of simply receiving the sum of $2,400, the Frego Law Firm would file an application for fees and costs, but it would not be limited to $2,400. However, the order still contained a mechanism for immediate payment of at least some of the fees and costs that might be awarded upon granting the application. Specifically, the order provided that for 30 days following the entry of the order confirming plan, the Trustee "shall hold from distribution the sum of $2,500 as a fund for the payment of the attorney fees and costs" awarded to the Frego Law Firm. The order also provided that the Debtor's plan payments would increase from $320.73 to $328.89 per week beginning April 1, 2006. The order also changed the treatment of Americredit's claim by providing that Americredit would have a "Class Five claim in the amount of $23,221.33 with 8.75% interest to be paid over 60 months" but, like the plan itself, the order did not state the actual monthly payment to be made to Americredit. Finally, the order increased the distribution to Class Eight unsecured creditors to 10%.

Putting aside the $2,500 being held back to pay a portion of the pre-confirmation attorney fees and costs to the Frego Law Firm, the Debtor's plan, as modified by the order confirming plan, provided for the following monthly payments to be made by the Debtor and for the following

-5-

monthly payments to be made by the Trustee to the creditors in Classes One through Five:

| | | |
|---|---|---|
| Monthly payments to be paid in by the Debtor: | $1,425.19 | (i.e., $328.89 per week x 52 weeks ÷ by 12 months) |
| Monthly payments to be paid out to creditors by the Chapter 13 Trustee: | 57.01 | Class One (statutory fees of the Trustee, i.e., 4% of the $1,425.19 received from the Debtor and paid out by the Trustee each month) |
| | 657.00 | Class Two (regular mortgage payment to Argent) |
| | 110.54 | Class Four (pre-petition mortgage arrearage of $3,979.56 owing to Argent ÷ by 60 months) |
| | 479.22 | Class Five (monthly payment to Americredit for Ford 500 calculated based on order confirming plan's provision for allowed claim of $23,221.33 with 8.75% interest over 60 months) |
| | 77.76 | Class Five (monthly payment to Dearborn Village for Taurus calculated based on plan's statement of "Total to Pay (Incl. Interest)" of $4,665.48 ÷ by 60 months) |
| | 9.17 | Class Five (monthly payment to Bd. of Water Commissioners) |
| | $1,390.70 | |

Section II.I. of the Debtor's plan, entitled "Order of Payment of Claims," provided that Class

One "shall be paid in advance of all claims," then Class Two "in advance of all remaining claims," then Classes Four and Five, and ultimately Classes Six and Eight. In sum, the Debtor's confirmed plan provided for her to pay the Trustee $1,425.19 each month with regularly scheduled distributions to be made by the Trustee of $1,390.70. This snapshot reflects a projected "surplus" of $34.51 each month that would ultimately be distributed to Class Six and Class Eight unsecured creditors after all other classes of creditors had been paid. Multiplied by the plan length of 60 months, that monthly surplus would produce the sum of $2,070.60 for the Class Six and Class Eight creditors. This amount is close to, but not quite, what was needed to pay the $1,400 Class Six priority unsecured claim to the City of Detroit plus the expected 10% dividend of $1,057.18 to Class Eight general unsecured creditors. The shortfall was only $384.58.

The obvious problem here was the cost of the attorney fees for the Chapter 13 case, especially with the requirement in the order confirming plan that the Trustee set aside $2,500 upon confirmation to pay the attorney fees and costs for the Frego Law Firm upon their allowance in the first month after confirmation. What would be the source of this $2,500? Because the Debtor had no income to pay it other than what was shown on her schedule I, the only way that the Trustee could pay the Frego Law Firm claim would be to delay the monthly payments to the other classes of claims under the plan. Far from having a theoretical "surplus" each month after confirmation of $34.51, the plan was in fact instantly underfunded in two ways: first, because of the $386.58 shortfall in payments to Class Six and Eight claims; and second, because the payment off the top of $2,500 of attorney fees to the Frego Law Firm delayed payments to the Class Two ongoing mortgage payment, the Class Four mortgage arrearage claim, and the Class Five secured claims for the two vehicles, until the $2,500 was paid in full. There would have been some funds available for the up front payment of the attorney fees and costs due to the difference between what the Debtor

was paying in and distributions made by the Trustee pre-confirmation. The Debtor's payments into the plan included enough for the full amount of the monthly payments for the two vehicles ($479.22 for the Ford 500 and $77.76 for the Taurus). However, up to confirmation, the Trustee was only required to pay Americredit and Dearborn Village their adequate protection payments ($171 to Americredit for the Ford 500 and $71.70 to Dearborn Village for the Taurus). Because the Debtor filed her petition on January 24, 2006, she was required to commence making payments within thirty days under § 1326(a)(1). With the plan being confirmed on April 19, 2006, there would have been three months (February, March and April) where the Debtor's payments into the plan for the vehicles exceeded the amount that the Trustee disbursed for the vehicles. The amount of the difference for the three months was approximately $942. Even if this approximate amount was therefore available on confirmation to be applied to the attorney fees and costs, it was not nearly enough to cover $2,500. The Debtor's plan was still immediately underfunded, although no party raised this objection and the Court confirmed the plan upon agreement of the parties. The only inference the Court can draw is that the Debtor, the Trustee and the creditors must have understood, and accepted, the fact that there would be a delay in the payments to creditors after confirmation.

After the plan was confirmed, the Frego Law Firm filed an application for compensation in the amount of $2,840.50 for fees and $238.72 for costs for a total of $3,079.22 incurred through April 24, 2006. This was more than $500 above the $2,500 that the Frego Law Firm had estimated at confirmation on April 18, 2006 and that the Trustee had set aside under the order confirming plan. No parties in interest objected to the application and the Court entered an order awarding these fees and costs in full on June 6, 2006. Presumably, the allowed fees and costs were paid in full out of the next available funds from the Trustee pursuant to the plan's "Order of Payment of Claims" provision, resulting in additional delay of payment to other creditors under the plan.

-8-

The next activity in the Court file was a motion for relief from stay filed by Dearborn Village on November 30, 2006. The motion alleged that the Debtor had fallen behind in her weekly payments of $328.89 to the Trustee in the aggregate amount of $3,962.70 and that Dearborn Village had not received any payments since it received a single interest payment in August, 2006. Further, Dearborn Village's calculations showed that because of the Debtor's delinquency, it would not receive any further payments until at least August, 2007. The Debtor's reply indicated only that she had been "out of work for a short while and would be returning soon." On January 5, 2007, the Court held a hearing on Dearborn Village's motion. Two days before that hearing, the Debtor filed a plan modification seeking to excuse a number of payments because she had been in a traffic accident in August, 2006 and was off of work for some period of time because of the injuries she sustained. At the Debtor's request, the Court adjourned the hearing on Dearborn Village's motion to lift stay until a hearing could also be held on the Debtor's proposed plan modification.

Shortly after Dearborn Village filed its motion to lift stay, Americredit did the same. Americredit's motion, filed on December 8, 2006, alleged the Debtor had failed to make her plan payments and that Americredit had received a grand total of only $273.50 in the entire Chapter 13 case. At the Debtor's request, the Court also adjourned the hearing on Americredit's motion to the same date as the hearing on the Debtor's proposed plan modification and the motion to lift stay filed by Dearborn Village. The Court scheduled all three matters for February 6, 2007.

On the day of the scheduled hearing, the Court was informed that Dearborn Village had settled its motion to lift stay. A stipulation was filed and an order was entered to evidence the settlement. The order provided Dearborn Village with a default clause regarding future payments to be made by the Debtor but did not address the Debtor's existing delinquency. The Court then heard the Debtor's proposed plan modification and Americredit's motion to lift stay. The Debtor

demonstrated that the reason she had missed certain payments was because of her injuries suffered in the car accident. The Court granted the Debtor's plan modification to the extent that it sought to excuse those plan payments that were required to be made by the Debtor during the period that she was injured and off of work as a result of those injuries. However, Americredit also argued that under § 1329(b)(1) of the Bankruptcy Code, the Debtor's plan modification could only be approved if it complied with all of the requirements of § 1325(a)(5) with respect to Americredit's secured claim. Americredit asserted that one of those requirements is that § 1325(a)(5)(B)(iii)(I) mandates that payments be made in "equal monthly amounts" with respect to each allowed secured claim where a debtor retains the collateral securing such claim and proposes periodic payments, as the Debtor in this case proposed for Americredit in her plan modification.[1]  The Court sustained that objection and held that it would only approve the Debtor's plan modification if it provided Ameritech with payments in equal monthly amounts from and after the effective date of the plan modification. Counsel for the Debtor and Americredit agreed that an equal monthly payment of $551.80 over the remaining 49 months of the Debtor's plan would pay Americredit's allowed secured claim in full. As a result, the Court's order approving the Debtor's plan modification specifically required payments in equal monthly amounts of $551.80 to be paid to Americredit on

---

[1] This objection was also available to Americredit at the time of the confirmation hearing on April 18, 2006. Because the plan provided for full payment of the Frego Law Firm's fees and costs of $2,500 upon allowance, and required the Trustee to set aside that sum, it was not arithmetically possible for Americredit to receive payments in "equal monthly amounts" under the plan because there simply were not sufficient funds required to be paid into the Debtor's plan to enable the Trustee to immediately pay $2,500 to Frego Law Firm and still make the required distributions on the Debtor's mortgage and car payments. Americredit did not raise this objection to the Debtor's plan prior to confirmation. At the hearing on the Debtor's plan modification on February 6, 2007, the Trustee speculated that since the "equal monthly amounts" requirement of § 1325(a)(5)(B)(iii)(I) had only recently been imposed by BAPCPA, the parties may not have fully understood or focused on this requirement when the Debtor's plan was confirmed.

account of its allowed secured claim beginning with the March, 2007 disbursement. The Court then denied Americredit's motion to lift stay.

Although it had settled its objection to the Debtor's proposed plan modification, and did not appear at the hearing on February 6, 2007 when the Court considered the Debtor's proposed plan modification, Dearborn Village filed a second motion to lift the automatic stay on April 13, 2007. In this motion, Dearborn Village did not rely on the future default clause that it bargained for when it settled its first motion for relief from the stay. Dearborn Village admitted that the Debtor was current in her plan payments. However, Dearborn Village complained that it had not received any payments since April, 2006. Further, a plan calculation showed it would not receive a distribution until sometime after January, 2009. This would have been three years into a five year plan. Thus, the underfunding was getting worse, not better, despite the Debtor honoring her obligation to make her plan payments.

The Court conducted a hearing on Dearborn Village's second motion on May 22, 2007. After some discussion on the record between counsel for the Debtor and Dearborn Village, the parties requested that the Court adjourn the hearing on the motion to lift stay because they were unable to reconcile various numbers pertaining to the amounts paid in by the Debtor and the amounts paid out by the Trustee. The Court granted their request and rescheduled Dearborn Village's second motion to lift stay for June 12, 2007. At the hearing on June 12, 2007, Dearborn Village informed the Court that it had still not received any payments. Over the Debtor's objections, the Court granted Dearborn Village's motion to lift the automatic stay at that hearing.

On June 26, 2007, the Frego Law Firm filed its first application for fees and costs incurred post-confirmation from April 25, 2006 to May 31, 2007. It sought fees in the amount of $5,251.50 and reimbursement of expenses in the amount of $402.65. Both the Trustee and the Debtor objected.

-11-

On August 21, 2007, the Court held a hearing with respect to the Frego Law Firm's application and the objections to it by the Trustee and the Debtor. At the time of the hearing, the Trustee informed the Court that the Debtor had made all of her required plan payments except for those that had been excused by the Court during the time that the Debtor was injured and off of work.[2]

### III.  The Parties' Positions

The Frego Law Firm asserted that its post-confirmation services were reasonable, necessary and beneficial to the Debtor and the Debtor's estate and, therefore, the Court should award all of the fees and costs requested.

The Debtor objected to the requested fees and costs because she could not afford them. The Debtor also pointed out she had already lost one vehicle in this case and she was barely able to make her plan payments to try to save her home and her other car. Further, the Debtor complained that she was not advised by the Frego Law Firm that she could have filed a Chapter 7 case, and requested the Court permit her to hire another attorney to file a Chapter 7 case.[3] Finally, the Debtor could not

---

[2] At the same time, the Court also conducted a hearing with respect to six other Chapter 13 cases in which the Frego Law Firm had filed applications for fees and costs and in which the Trustee had filed objections. Because the Trustee's objections to the applications filed in all of those cases raised a number of similar issues, the Frego Law Firm and the Trustee consented to have them heard together with one record for all of the cases except that a separate record would be necessary to address the additional issues raised by the Debtor and the Trustee in this case that were not present in any of the other cases. With the consent of the Frego Law Firm and the Trustee, the Court then made its rulings on August 21, 2007 on each of the legal issues raised by the Frego Law Firm and the Trustee that were common to all of these cases and indicated that it would then apply those legal rulings to the applications for fees filed in each of these cases by the Frego Law Firm. The Court further explained that it would enter a separate order in each of these cases applying the rulings made by it on the record on August 21, 2007 to the particular applications and objections in each of these cases. The Court then entered orders in all of those cases except for this case and took this case under advisement.

[3] Since the hearing on August 21, 2007, the Debtor has taken action consistent with her stated position. On October 19, 2007, a notice of substitution of counsel was filed. On October 23, 2007, the Debtor filed a notice of conversion to Chapter 7.

-12-

understand why Dearborn Village and Americredit did not receive their payments under her plan even though she had increased her plan payments and returned to work sooner than she should have after her injuries in order to save this case.

The Trustee first objected to specific line items, similar if not identical to the Trustee's objections in the other six cases heard by the Court on August 21, 2007. Those objections pertained to the hourly rates charged for certain employees of the Frego Law Firm, charges for clerical services and charges for duplicate services. The Court has determined to reduce the requested fees by $287 based on the Trustee's objections to specific time entries and will explain the reduction later in this opinion. In the Court's view, while those specific line item objections are important, they were already addressed by the Court in detail on the record on August 21, 2007.

The larger issue raised by the Trustee and addressed by this opinion, is the Trustee's contention that the fees and costs sought by the Frego Law Firm "far outweigh any benefit to the Debtor or to the creditors." In support, the Trustee asserted that this Chapter 13 plan was underfunded to begin with and that fact has only been exacerbated by the additional post-confirmation fees and costs incurred by the Frego Law Firm. According to the Trustee, the Debtor's 60 month plan, as of August 21, 2007, was already running 71 months long. Worse yet, if the Court awards Frego Law Firm's fees and costs, the Trustee explained that the Debtor's plan would run 82 months long, making it a virtual certainty that the Debtor's plan would not complete and that the Debtor would not obtain her discharge. Further, the Trustee pointed out that, if awarded, these fees and costs, when added to the pre-confirmation fees and costs already awarded, would result in the Frego Law Firm receiving a grand total of fees and costs of $8,733.37. The Trustee noted that the total unsecured debts scheduled in this case aggregate only $10,571.76. In other words, the fees and costs incurred to represent the Debtor in this Chapter 13 case would be more than 83% of the

-13-

Debtor's scheduled unsecured claims. The Trustee argued that this fact alone makes the request patently unreasonable. The Trustee contended that the Frego Law Firm should only be awarded, at most, 50% of the post-confirmation fees and costs it now seeks.

The Frego Law Firm replied that even if the award of its fees and costs caused the Debtor's plan to run long and ultimately fail, it should still be awarded all the fees and costs it seeks because all of its services were rendered at the request of the Debtor, the services were capably performed, and the services benefitted the Debtor by preventing secured creditors from repossessing the Debtor's two automobiles and foreclosing upon the Debtor's home. The Frego Law Firm further argued that, even if the Debtor's efforts to prosecute this Chapter 13 case ultimately failed (as we now know they have), the Frego Law Firm should not be penalized for such failure.

## IV. Applicable Standards

Section 330(a)(1)(A) provides that the Court may award "reasonable compensation for actual, necessary services rendered by . . . [a] professional person, or attorney and by any paraprofessional person employed by any such person . . . ." The Sixth Circuit Court of Appeals has directed that bankruptcy courts should use the lodestar method in determining reasonable attorney fees under § 330(a) of the Bankruptcy Code. Boddy v. United States Bankruptcy Court (In re Boddy), 950 F.2d 334, 337 (6th Cir. 1991).

> The starting point in the lodestar analysis is to determine a reasonable hourly rate. A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation. The next step in the analysis is to determine the lawyer's reasonable hours. If the court disallows hours, it must explain which hours are disallowed and show why an award of these hours would be improper.

In re Williams, 357 B.R. 434, 438-39 (B.A.P. 6th Cir. 2007) (citations omitted). But see In re Argento, 282 B.R. 108, 116 (Bankr. D. Mass. 2002) (noting that "[m]any courts have addressed the issue of whether the so-called lodestar analysis continues to be appropriate in chapter 13 cases, at

-14-

least those filed after October 22, 1994 when section 330(a)(4)(B) became effective") (citations omitted).

"The burden of proof is on the professional requesting compensation for his or her services from the bankruptcy estate." In re Sharp, 367 B.R. 582, 585 (Bankr. E.D. Mich. 2007) (citing In re New Boston Coke Corp., 299 B.R. 432 (Bankr. E.D. Mich. 2003)). "This burden is not to be taken lightly, especially given that every dollar expended on legal fees results in a dollar less that is available for distribution to the creditors or use by debtor." In re Pettibone Corp., 74 B.R. 293, 299 (Bankr. N.D. Ill. 1987) (citation omitted). "While the burden is on the applicant to justify a fee request, the bankruptcy court must expressly discuss the amounts that are not supported by the application and provide a reasoning to support the court's decision. In re Williams, 357 B.R. at 439 (internal quotation marks and citation omitted). "Regardless whether objections are raised to the application seeking compensation from the bankruptcy estate, the Court has a duty to independently examine the reasonableness of the requested fees." In re J.F. Wagner's Sons Co., 135 B.R. 264, 266 (Bankr. W.D. Ky. 1991).

In determining the amount of reasonable compensation to be awarded, § 330(a)(3) sets forth a number of non-exclusive factors for the Court to consider:

[T]he court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

Section 330(a)(4)(A) provides that the Court shall not allow compensation for unnecessary duplication of services or services that were not reasonably likely to benefit the Debtor's estate or that were not necessary to the administration of the case. However, in 1994 this section of the Bankruptcy Code was amended to provide that even if services were not reasonably likely to benefit the debtor's estate, or were not necessary to the administration of the case, the Court may still award such fees in a Chapter 13 case if such services were shown to be beneficial or necessary to an individual debtor in such case.

In a chapter 12 or chapter 13 case in which the debtor is an individual, the court may allow reasonable compensation to the debtor's attorney for representing the interests of the debtor in connection with the bankruptcy case based on a consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section.

11 U.S.C. § 330(a)(4)(B).

Section 330(a)(4)(B) essentially represents "an exception to the general rule that professionals' services fees are compensable only to the extent that they benefit the estate." 5 Collier on Bankruptcy ¶ 330.04[1][b][v] (15th ed. rev. 2007). "Therefore a Chapter 13 debtor's counsel is entitled to an administrative expense for compensation for work that is beneficial and necessary to the debtor without proof of benefit or necessity to the Chapter 13 estate or the creditors." In re Argento, 282 B.R. 108, 116 (Bankr. D. Mass. 2002) (internal quotation marks and citation omitted).

Generally, "services that benefit the debtor in connection with the case are services that facilitate the successful completion of the debtor's plan." 5 <u>Collier on Bankruptcy</u> ¶ 330.04[1][b][v]. Some other examples of services that might benefit the debtor are services rendered to defend a debtor's claim of exemptions; to defend a motion to lift stay; or to determine the non-dischargeability of a debt. <u>Id.</u> ¶ 330.04[2] (citation omitted). Of course, even those services that benefit only the individual debtor, and not the debtor's estate, are only compensable under § 330(a)(4)(B) to the extent that they are "reasonable" after consideration of the benefit and necessity of those services to the debtor in light of the other factors set forth in § 330(a)(3). There are no controlling decisions interpreting § 330(a)(4)(B) in the Sixth Circuit, but there are a few cases from other circuits that have explored the distinction between services that are beneficial or necessary to a debtor, as opposed to services that are beneficial or necessary to a debtor's estate.

In <u>In re Polishuk</u>, 258 B.R. 238 (Bankr. N.D. Okla. 2001), the Court discussed the concept of "benefit" to the estate as one of the factors to consider under § 330(a)(3)(C).

> [C]ourts are to consider the necessity of the services at the time they were rendered, not at the time the court reviews the application. In order to benefit the estate, the services rendered must relate to a realistically obtainable goal. Counsel for a debtor or debtor in possession will not be compensated for time spent in preparation of a plan which has no realistic hope of confirmation.

258 B.R. at 248-49 (citing in part <u>In re Saturley</u>, 131 B.R. 509, 521 (Bankr. D. Me. 1991) ("[F]utile efforts aimed at achieving unattainable objectives are unreasonable. Fees generated in tilting at windmills will be disallowed.")) (other citations omitted); <u>see also</u> <u>In re Mflex Corp.</u>, 172 B.R. 854, 857 (Bankr. W.D. Tex. 1994) ("Chapter 11 cases which lack viable chances of reorganization may place the fees of counsel at risk. . . . [A]t some point counsel for the Debtor should have recognized that reorganization was not feasible and that services of counsel in that direction would be of no benefit to the estate.") (internal quotation marks and citations omitted). "[T]he fact that a debtor

derives personal benefit from the delay of collection efforts against him or her due to the bankruptcy case does not constitute a benefit for purposes of awarding compensation." Id. (citing Bachman v. Pelofsky (In re Peterson), 251 B.R. 359, 365 (B.A.P. 8th Cir. 2000) (finding no abuse of discretion on the part of the bankruptcy court in reducing fees in a "fairly routine Chapter 13 case with few complexities " because counsel's efforts "resulted in no benefit to the debtor under § 330(a)(4)(B), other than to cause a delay in payment")).

However, the requirement that services relate to a realistically obtainable goal does not mean that an attorney is the guarantor of the successful completion of a chapter 13 case.

> Counsel in a chapter 13 case is not responsible to assure that the Debtor can or will make payments to the trustee.  Counsel is not responsible to assure that the Debtor will fulfill any of the other requirements for confirming a plan and obtaining a discharge.  Counsel is not responsible to guarantee the completeness or absolute accuracy of any of the information provided by the Debtor.
>
> . . . But . . . [t]o justify more than a nominal fee, counsel must provide evidence of valuable professional efforts to investigate and to evaluate the facts, valuable professional efforts to assess the prospects for confirming a chapter 13 plan, valuable professional efforts to confirm a chapter 13 plan, valuable professional client counseling concerning the debtor's postpetition duties and responsibilities, and a reasonable belief that a plan could be confirmed and consummated.

In re Phillips, 291 B.R. 72, 82-83 (Bankr. S.D. Tex. 2003).

Several published cases have also addressed whether the services at issue may have provided a benefit to a debtor even where no benefit to the debtor's estate was shown.  In In re Pirani, 232 B.R. 891 (Bankr. E.D. Tex. 1999), the debtor's counsel incurred considerable fees in litigating claims in other forums.  The court found that those efforts  "appear to have been of no benefit to the estate and of questionable benefit to the debtor" because the lawsuits were pending as of the petition date and thus "would have been stayed as to the Debtor."  232 B.R. at 893.  In addition, there was "no explanation as to why the claims in both forums could not have simply been listed and discharged in [the bankruptcy] proceeding."  Id.

-18-

In re Burton, 278 B.R. 645 (Bankr. M.D. Ga. 2001) involved an elderly debtor who was receiving only social security disability income. Id. at 647. She had minimal debts of her own, with one secured debt for furniture. There was no evidence that she was having trouble paying that debt. Her only major debt was as co-obligor on her son's student loan debt, which he incurred after having filed his own chapter 13 case. Id. at 647-48. In substantially reducing the fees, the court expressed its concern that counsel had not considered filing a Chapter 7 petition and questioned whether any petition should have been filed.

> In the first instance, the Court considered the question of whether the case should have ever been filed. This Debtor might have been more ably and economically assisted by legal counsel that would have discouraged the filing of a Chapter 13 case. . . . The reason for the filing of this Chapter 13 case was solely attributable to the pressure brought by the student loan creditor. If the option of not filing any bankruptcy case was not urged by Debtor's counsel, the option of filing a Chapter 7 case should have been considered.

Id. at 651. "The consideration by the Court of the matter of attorney fees and the related policy considerations must not result in a decision . . . which enlarges the hardship endured by this Debtor." Id. at 648.

## V. Analysis

The issue in this case is not whether the Frego Law Firm performed the post-confirmation services that formed the basis for its fee application, nor whether the time expended by it was reasonable for the services performed. Its time sheets document the services performed and its lawyers worked diligently. The real question is whether these post-confirmation services were necessary or beneficial to either the Debtor's estate or the Debtor.

The Court will first examine possible benefits to the estate. The services rendered in resisting Americredit's motion to lift stay were arguably necessary and beneficial to the estate. They enabled the Debtor to continue to possess the vehicle that provided her with transportation to and

-19-

from work to generate the income that funded the plan payments. In contrast, the services rendered in fighting Dearborn Village's motions to lift stay were neither necessary or beneficial to the estate. That vehicle was not used for the Debtor's transportation to her job. Its retention may have benefitted the Debtor's non-filing spouse, but it did not benefit the Debtor's estate. The rendering of the post-confirmation services regarding the plan modification, while undertaken to prevent the case from being dismissed, actually caused the Debtor's creditors to receive less, not more, than they would have otherwise received. Argent did not somehow receive more on its mortgage claim than it otherwise would have received because of the services of the Frego Law Firm. Americredit and Dearborn Village received virtually nothing under the Debtor's Chapter 13 plan and were forced to incur substantial fees to litigate the lifting of the automatic stay to retrieve their collateral. The unsecured creditors received nothing in this case. Even if the requested fees are not awarded, and even if the Debtor had not converted her case to Chapter 7, the Debtor's plan was running long and would not have resulted in any distribution to Class Eight unsecured creditors within its 60 month length. On these facts, it is hard to see how a substantial amount of the requested fees and costs were either necessary or beneficial to the Debtor's estate. The next issue to consider is whether those services benefitted the Debtor.

The first question that has to be asked and answered by a debtor's counsel in rendering post-confirmation services is whether those services are reasonably likely to benefit the debtor if not the estate. If the answer to this question is yes, then the next question becomes whether the burden of the fees being incurred is disproportionate to the benefit to be gained by the debtor. That analysis, balancing costs versus benefits, must be undertaken at the time the services are rendered. Even if the debtor's attorney considers the services to be reasonably likely to benefit the debtor, they must also assess the impact of their services, and the cost of those services, upon the debtor and the

debtor's plan. The attorney must then explain that impact to the debtor so that the debtor can make a fully informed choice as to how to proceed.

It is readily apparent that the Frego Law Firm worked hard in this case. Lawyers from the Frego Law Firm appeared at each of the hearings on the various motions to lift stay and the plan modification, and zealously advocated for the Debtor. As a result of their efforts, the Debtor was able to retain the Taurus from the commencement of this case on January 24, 2006 through June 29, 2007, the date that Dearborn Village obtained an order lifting the stay, all with paying only $88.38 to Dearborn Village. One can argue that the Debtor enjoyed a benefit by her non-filing spouse having the use of this vehicle without paying for it. Similarly, Americredit did not obtain a lift of stay and the Debtor continued to possess the Ford 500. It is not clear to the Court how much Americredit has actually been paid, but it is beyond dispute that it did not receive all of the payments that it was entitled to receive under § 1325(a)(5). To the extent that the Debtor was able to continue to drive that car too without paying for it conceivably benefitted the Debtor, at least in the short term. The Debtor may also have benefitted by proposing a plan modification that enabled her to be excused from making some of her required payments during the time she was injured. However, all of these possible benefits ultimately consist only of some form of delay. To determine whether the delay gained by the Frego Law Firm's services was reasonably likely to benefit the Debtor, or just forestalled the inevitable, first requires an understanding of the Debtor's circumstances at the time that those services were rendered.

At the time that the Frego Law Firm performed the services at issue in this opinion, the Debtor had a confirmed Chapter 13 plan. However, it is also true that it was an underfunded plan from the start. According to the order confirming plan, the Debtor's plan payments were $1,425.19 per month. But, as explained earlier in this opinion, the monthly payments for the Trustee's

statutory fee, the regular mortgage payment, the mortgage arrearage, the two cars and the Board of Water Commissioners alone totaled $1,390.70. Unfortunately, that left only $34.51 per month as a source to pay the Frego Law Firm's pre-confirmation attorney fees and, eventually, the Class Six and Class Eight unsecured creditors. More importantly, it left no funds available to make a "lump sum" payment of $2,500 to pay the Frego Law Firm upon confirmation as required by the order confirming the plan, let alone pay all of the actual pre-confirmation fees and costs of $3,079.22 that were requested after confirmation and awarded by the Court on June 6, 2006. A fee of $3,079.22 is not an unreasonable fee to prosecute a Chapter 13 case and fully represent the Debtor pre-confirmation. Nor is there anything in the Bankruptcy Code that prohibits payment of the entire fee immediately after confirmation. Indeed, § 1326(b)(2) of the Bankruptcy Code requires payment of administrative claims before or at the time of each payment to creditors under the plan. However, because the Debtor did not have the money to pay it up front in this case, its lump sum payment in full upon allowance could only be made by the Trustee delaying the monthly payments that were required to be made to the Debtor's other creditors. By paying the pre-confirmation fees and costs immediately, instead of spreading them out over time, the Debtor's plan was underfunded at confirmation.

The allowance of the Frego Law Firm's pre-confirmation fees and their method of payout is not at issue now. That's long over. However, a full understanding of the impact of those fees on the Debtor's ability to perform according to the terms of her confirmed Chapter 13 plan provides insight in determining whether the Frego Law Firm's post-confirmation services either benefitted or were reasonably like to have benefitted the Debtor at the time when they were performed. The Debtor's creditors were apparently willing at confirmation to suffer a delay in receiving their payments so that the Debtor's pre-confirmation attorney fees could be first paid in full. But, as the

-22-

Frego Law Firm must have understood, the Debtor's plan would only have a chance to work if things went perfectly as planned for the Debtor after confirmation, *plus* the Debtor was somehow able to make up the $386 underfunding for Class Six and Eight claims, *plus* pay into the plan $3,079 for the pre-confirmation fees and costs already awarded. Unfortunately, this did not happen.

In August, 2006, the Debtor was in a car accident and, as a result, was off from work for a substantial period of time necessitating the plan modification that excused her payments from August 3 through October 26, 2006. The Debtor's underfunded plan, already running long because of the pre-confirmation attorney fees, was now running hopelessly long. Predictably, Americredit and Dearborn Village filed their motions to lift stay. The Frego Law Firm fought hard for the Debtor to resist the relief requested by those creditors, incurring substantial fees in doing so. The Debtor's plan would not have timely completed regardless of what the Court did with these fees, and the Debtor has now converted to Chapter 7. But the Frego Law Firm requests that the Court allow these fees because it did what its client wanted it to do, did it well, and it would be unfair of the Court to now play Monday morning quarterback and reduce these fees.

First, the Court rejects any suggestion that the Frego Law Firm should be awarded all of its fees and costs simply because it was only doing what its client wanted to do. Michigan Rule of Professional Conduct 2.1 plainly states that, "[i]n representing a client, a lawyer shall exercise independent professional judgment and shall render candid advice." Just because a client wants to embark on a course of action does not mean that the lawyer is obligated to assist the client in pursuing that course of action if it is inconsistent with the exercise of independent professional judgment by the lawyer. Nor does it mean that the fees incurred in pursuing that course of action must be allowed. See In re Saturley, 131 B.R. 509, 521 (Bankr. D. Me. 1991) ("[F]utile efforts aimed at achieving unattainable objectives are unreasonable. Fees generated in tilting at windmills

will be disallowed.").

Second, it is obvious that the Debtor did not have the means to accomplish what she hoped. The Court sympathizes with the Debtor, who wished to retain her house and her two automobiles for herself and her husband. But sometimes sympathy must be tempered by a hard dose of reality. This Debtor simply did not have enough income to afford the house, the two cars, the front loaded pre-confirmation attorney fees, and a 10% dividend to unsecured creditors, much less another $5,654.15 of post-confirmation fees and costs. That was clear from the outset. Part of an attorney's duty is to be a counselor and advisor. "Legal advice often involves unpleasant facts and alternatives that a client may be disinclined to confront. . . . [A] lawyer should not be deterred from giving candid advice by the prospect that the advice will be unpalatable to the client." Mich. R. Prof. Conduct 2.1 cmt. (1988). A candid analysis at the time of the post-confirmation services would have told the Debtor that she just could not afford her Chapter 13 plan and the cost of the fight to save it. Granted, the Frego Law Firm was successful in persuading Argent, Americredit and Dearborn Village to accept a delay in receiving their payments under the plan while it received its pre-confirmation fees in full up front. However, the Frego Law Firm had to know that this strategy, even if arguably sound at confirmation, became doomed once the Debtor suffered her car accident and was out of work. At least from that point forward, it made no sense to incur large attorney fees by relentlessly fighting the efforts of Americredit and Dearborn Village to lift the automatic stay to take back their vehicles. Without additional income from the Debtor, the Frego Law Firm was now just staving off the inevitable, but doing so at a very substantial cost to the Debtor.

In the Court's experience, the Frego Law Firm has capable, experienced counsel who work hard for their clients. But they knew or should have known that continuing to fight to keep this case alive, retain the home and the two cars, and incurring substantial fees to do so, was a pursuit

-24-

destined to fail. Their services in litigating the Dearborn Village motions to lift stay were not reasonably likely to benefit the Debtor. Their services in litigating the Americredit motions to lift stay, while conceivably creating some benefit to the Debtor and her estate, imposed a cost upon the Debtor that was greater than any benefit to be derived. Even if temporarily successful in delaying the Debtor's secured creditors from repossessing their collateral, the cost of the post-confirmation services was prohibitive and bound to ultimately sink the Debtor's plan. There is nothing in the record to show that the Debtor would ever have the money to pay all of these attorney fees. "The consideration by the Court of the matter of attorney fees and the related policy considerations must not result in a decision . . . which enlarges the hardship endured by this Debtor." In re Burton, 278 B.R. 645, 648 (Bankr. M.D. Ga. 2001).

## VI. Conclusion

On balance, the Court finds that the Debtor enjoyed some temporary benefits consisting largely of her ability to continue to possess the two vehicles and pay her mortgage and arrearage for a period of time through her Chapter 13 plan. In the final analysis, that is not enough benefit to support the Frego Law Firm's request for post-confirmation fees and costs in the amount of $5,654.15. In this case, after applying the lodestar analysis and considering the benefit to the Debtor's estate and to the Debtor, the Court concludes that the Frego Law Firm should be awarded fees through the first entry for February 6, 2007. The time records show a plan review and calculation on January 24, 2007 and another one performed on February 5, 2007. The first February 6, 2007 entry is for a meeting with the Debtor to discuss "probable hearing occurrences" and to review "proof of payments." If the Frego Law firm did not review their fees up to that point, it should have, and should have included that amount in their plan calculations. It should also have been apparent upon reviewing the Trustee's records and plan payments twice in two weeks, that the

Debtor had complied with her payment obligations, other than the payments addressed in the proposed plan modification. The hearing that counsel was preparing for was the hearing on the plan modification and Americredit's motion for relief. It should have been abundantly clear at this point that the plan was underfunded and infeasible. Instead of incurring more fees fighting the stay motions and pursuing a plan modification that did nothing to address a fatally flawed plan, the Frego Law firm should have stopped the losses and advised the Debtor to convert to Chapter 7.

The total of the post-confirmation fees up to and including the first entry for February 6, 2007 was $3,092.00. For the reasons explained on the record on August 21, 2007, the Court will reduce those requested fees by $287. This amount is comprised of $92.50 for the fifth entry on January 3, 2007 for clerical services; and $18.50 for the seventh entry on January 3, 2007 and $123 for January 10, 2007 for services that were excessive and of no benefit to the Debtor or the estate. In addition, the Court approves compensation for Joshua B. Sanfield at the rate of $175 per hour, a $10 reduction from the $185 requested. From September 20, 2006 through February 6, 2007. Mr. Sanfield performed 5.4 hours of services. The fees are reduced by $54 for this reason. Accordingly, the Court concludes that reasonable compensation is $2,804 of fees plus $402.65 in expenses, for a total of $3,206.65. The Court will enter an order awarding that sum and disallowing the balance of the fees and costs requested by the Frego Law Firm.

**For publication**

Signed on December 4, 2007

> /s/ Phillip J. Shefferly
> Phillip J. Shefferly
> United States Bankruptcy Judge